## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**S.R.,** by and through his next friend,    :
Philip Rosenbaur, **Theodore Smith,** by  :
and through his next friend, Ashley     :
Maddison; **S.H.,** by and through her   :
next friend, Julia Shmilovich; **M.T.,** by  :
and through his next friend, Ashley     :
Maddison; **N.C.,** by and through his   :
next friend, Sue Walther, **Chrystal**    :    Civil Action No:
**Steward**, by and through her next friend,:
Deborah Fegan, on behalf of themselves:
and all others similarly situated,      :    Class Action
                                 :
        Plaintiffs,            :
                                 :
     v.                         :
                                 :
**Pennsylvania Department of Human**  :
**Services**, and **Teresa Miller**, in her   :
official capacity as Acting Secretary of  :
the Department of Human           :
Services,                        :
                                 :
        Defendants.        :

## **COMPLAINT**

    Plaintiffs, by and through their next friends, bring this action on behalf

of themselves and all others similarly situated against defendants

Pennsylvania Department of Human Services (DHS) and Teresa Miller,

Acting Secretary of DHS, and in support thereof alleges as follows:

1

## Introduction

1.  The Child Welfare system in Pennsylvania exists to protect children who are abused or neglected by their families or caregivers by providing services to strengthen families, and residential placements and services for children who cannot safely return to their homes.  Once a child is adjudicated as a "dependent" child in Pennsylvania, the Commonwealth, through the DHS Office of Children, Youth and Families and the Child Welfare programs in each of the counties, is responsible for the child's needs, including safety, health care, a place to live, and planning for a permanent family connection for the child either through family reunification, foster care, or adoption.

2.  There are thousands of children in the dependency system in Pennsylvania, and a significant number of those children have mental illness and/or behavioral health disabilities.  Many dependent children have post-traumatic stress disorder or other mental health disabilities due to abuse they suffered in childhood.  Others have existing or developing mental health conditions that are exacerbated by abuse, neglect, or the conditions of their lives in the dependency system.

3.  For these children, DHS, through the Child Welfare system and its Office of Medical Assistance Programs (Medical Assistance), is responsible

for providing appropriate mental health care as well, including therapeutic foster care, trauma-informed mental health care, other mental and behavioral health services, and residential treatment facilities (RTFs), if necessary.

4.   Despite the mandate for their protection, many dependent children with mental health disabilities experience something very different.  Many end up segregated in large, congregate facilities – modern-day orphanages -- for years, and far beyond the point that such placements are needed or beneficial.  Others bounce between such facilities every year or so, being informed that they have "failed to adjust" to such institutional life, racking up five to ten such placements by the time they reach their teens.  Some of these children commit acts that are manifestations of their disabilities and the product of continual displacement – physically acting out, running away, or substance abuse – that result in their being adjudicated "delinquent" as well.

5.   Many dependent children with mental health disabilities end up waiting for months and even years in unnecessary and inappropriate settings, such as psychiatric hospitals, juvenile detention facilities, or RTFs, not because they are medically or legally required to be there, but because they are waiting for an appropriate placement from DHS.

6.  Sometimes, after waiting long periods of time, children are sent to large, segregated facilities out of state, far away from any family members or friends they may have in their lives.  The message is clear to these children; they know that "there is no place for them in Pennsylvania."

7.  Under these circumstances, the opportunities for these children to develop permanent family connections, friends, school mates, or a sense of community are few.  This is no way to spend a childhood.

8.  This lawsuit is filed to end this practice.  DHS is required to provide appropriate services and placements in the least restrictive, most integrated settings to all dependent children without unreasonable wait.  It is no excuse legally that there are "no beds available" or "no placements will accept" these youth.  Those statements, repeated around the Commonwealth, are evidence of the illegal and discriminatory deficiencies in the system.

9.  Plaintiffs S.R., Theodore Smith (Teddy), S.H., M.T., N.C., and Chrystal Steward are such youth.  All have mental health disabilities and have been adjudicated dependent.

10.  S.R. is a 10-year-old dependent child with mental health disabilities waiting in a RTF.  He has been there for over 3 years.  His psychiatrist notes a "lack of discharge options" as a barrier to his treatment.

The RTF feels he has "maximized his treatment" there and plans to discharge him when another appropriate setting is found. Defendants have failed to provide an appropriate family or community-based placement for him with appropriate services.

11.  After Plaintiff Teddy Smith spent several months unnecessarily in a juvenile detention center awaiting an appropriate placement from DHS, he was moved to a secure state-operated youth development center, where he was assaulted by staff within the first two weeks.  Staff accused Teddy of assault, and he was arrested and sent to the county jail for over a month.   The charges against Teddy were cleared, but tragically, he was returned to the same juvenile detention center where he again awaits services.

12. Plaintiffs S.H. and M.T. are in that same local juvenile detention center, awaiting services from Medical Assistance and a place to live from Child Welfare.  Teddy, S.H., and M.T. are now needlessly locked in a juvenile detention center, a place designed for youth to stay an average of 10 to 15 days, waiting for an appropriate placement and services, each for more than 200 days.

13.  Plaintiff N.C. has been bounced around foster care and institutions for years, including a state youth development center, awaiting

an appropriate placement from DHS.  He was scheduled to be sent to an out-of-state placement on December 13, 2017 because DHS provided no placement and services in Pennsylvania.

14.  Plaintiff Steward is now waiting unnecessarily at a psychiatric hospital for a placement, after being ready for discharge from the hospital for nearly one year.

15.  DHS is responsible to ensure that Plaintiffs are provided with Child Welfare services, including appropriate places to live, and to ensure the provision of needed mental and behavioral health services.

16.  Defendant Miller, in her role as Acting Secretary of DHS, is unlawfully denying Medical Assistance (MA) funded behavioral health services that are medically necessary to named Plaintiffs, and failing to provide plaintiffs services with reasonable promptness in violation of Title XIX of the Social Security Act (Title XIX).

17. Defendants are discriminating against named Plaintiffs by failing to provide Child Welfare services equal to those provided to children without mental health disabilities, and by failing to provide services in Pennsylvania in the most integrated settings appropriate to the needs of named Plaintiffs, in violation of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act (RA).

18. There are hundreds of other dependent children with mental illness and behavioral health disabilities who are subject to, or at serious risk of, the same discriminatory treatment and lack of medically necessary services.

19. Plaintiffs seek declaratory and injunctive relief requiring Defendants to develop an adequate array of Child Welfare and mental and behavioral health services, including but not limited to trauma-informed and community-based mental health services and time-limited, effective residential treatment options when necessary, such that allow dependent children with mental illness and behavioral health disabilities to be able to achieve reunification, permanency, and stability on par with their peers and to access medically necessary mental health services in the most integrated settings appropriate to their needs.

### Jurisdiction and Venue

20. Jurisdiction is conferred upon this Court by virtue of 28 U.S.C. §§ 1331 and 1343, this being a case arising under the laws of the United States.

21. Plaintiffs' claims are authorized by 42 U.S.C. § 1396 *et seq.,* 42 U.S.C. § 1983, 29 U.S.C. § 794a and 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. § 12133.

22. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b)(1) since the Defendants reside in this district.

## Parties

23. Plaintiff S.R. is a ten-year-old boy from Beaver County, Pennsylvania.  He has diagnosed mental illnesses and brings this action through his next friend, Philip Rosenbaur.  He brings this action on behalf of himself and all others similarly situated.

24. Plaintiff Teddy Smith is an eighteen-year-old young man from Philadelphia, Pennsylvania.  Smith has diagnosed mental illnesses and brings this action through his next friend, Ashley Maddison.  He brings this action on behalf of himself and all others similarly situated.

25. Plaintiff S.H. is a fifteen-year-old girl from Philadelphia, Pennsylvania.  S.H. has diagnosed mental illnesses and brings this action through her next friend, Julia Shmilovich.  She brings this action on behalf of herself and all others similarly situated.

26. Plaintiff M.T. is a sixteen-year-old boy from Philadelphia, Pennsylvania.  M.T. has diagnosed mental illness and brings this action through his next friend, Ashley Maddison.  He brings this action on behalf of himself and all others similarly situated.

27. Plaintiff N.C. is a fifteen-year-old boy from York County, Pennsylvania.  N.C. has diagnosed mental illnesses and brings this action through his next friend, Sue Walther.  He brings this action on behalf of himself and all others similarly situated.

28. Plaintiff Chrystal Steward is a nineteen-year-old young woman from Philadelphia, Pennsylvania.  Chrystal has diagnosed mental illnesses and brings this action through her next friend, Deborah Fegan.  She brings this action on behalf of herself and all others similarly situated.

29. Defendant DHS is the single state agency responsible for the provision of MA services, both institutional and community-based, to eligible residents of the Commonwealth of Pennsylvania.  Defendant DHS is also the agency responsible for oversight of the Child Welfare system in the Commonwealth.

30. Defendant Teresa Miller is the Acting Secretary of DHS and as such is responsible for overseeing both MA and Child Welfare services in the Commonwealth of Pennsylvania.

## Facts

### A.     The Pennsylvania Child Welfare System

31. The Pennsylvania Child Welfare system is governed by a variety of state and federal laws.

32. Under state law, Defendant DHS has responsibility to assure the provision of adequate Child Welfare services to Pennsylvania youth.  62 P.S. § 701.

33. Defendant DHS fulfills this responsibility through its Office of Children, Youth and Families (OCYF).

34. Under state law, the counties operate local children and youth services agencies, which have the power and duty to provide Child Welfare services.  *See* 62 P.S. § 2305.

35. Defendant DHS, through OCYF, is responsible to supervise the provision of Child Welfare services by local children and youth services agencies.  *See* 55 Pa. Code § 3130.12(b).

36. DHS is responsible for regulating, supervising, and monitoring the administration of Child Welfare services, and for providing reimbursement for such services, to help maintain children in their own homes; prevent neglect, abuse, and exploitation; overcome problems that result in dependency or delinquency; provide adequate substitute care to any child

in need of such care; and provide services and care ordered by the court for children who have been adjudicated dependent or delinquent. 62 P.S. § 2305; 55 Pa. Code § 3130.12.

37. Under both federal and state law, the goal and purpose of Child Welfare services is stability and permanency for dependent children, that is, minimizing the number of placements a child must experience and minimizing the amount of time spent by the child outside of a permanent family setting. Services must be provided to children to achieve stability and permanency along the following hierarchy: return to parent, adoption, placement with permanent legal guardian, placement with a fit and willing relative, and when those have failed, another planned permanent living arrangement in the most integrated setting appropriate to the child's needs.

38. Pursuant to Pennsylvania's Juvenile Act, prior to removing a child from his or her home, a court must find "that continuation of the child in his home would be contrary to the welfare, safety or health of the child." 42 Pa. C.S. § 6351(b).

39. Finally, under federal law, each child must have "a case plan designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available and in close

proximity to the parents' home, consistent with the best interest and special needs of the child." 42 U.S.C. § 675(5)(A).

40. Child is defined in the Juvenile Act to include not only those under the age of 18, but also those between the ages of 18 and 21 who had been adjudicated dependent prior to the age of 18, who request to remain in the Child Welfare system, and who are determined by a court to be enrolled in a school, training or work program, or unable to do so by reason of a medical or behavioral health condition.  42 Pa. C.S. § 6302.

41. Consistent with the ADA and RA, Defendants must serve children with disabilities in the most integrated settings appropriate to their needs, which means settings with individuals without disabilities that are not segregated from the community.

B.    **Pennsylvania's Medical Assistance Program**

42.   Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.,* establishes the federal Medical Assistance program.  Through the MA program, the federal government reimburses more than half of the expenditures incurred by states that elect to furnish certain healthcare services to eligible individuals.

43. States are not required to participate in the MA program but, if they choose to do so, they must comply with Title XIX and its implementing regulations. Pennsylvania has chosen to participate in the MA program.

44. Title XIX mandates that a state MA program provide certain specified health care services. 42 U.S.C. § 1396a(a)(10)(A). For persons under 21, those services include Early and Periodic Screening, Diagnosis and Treatment (EPSDT), which is defined to include all "necessary health care, diagnostic services, treatment, and other measures described in section [1396d(a)] to correct or ameliorate defects and physical and mental illness and conditions." 42 U.S.C. § 1396d(a)(4)(B) and (r)(5).

45. Among many other things, services described in section 1396d(a) and thus encompassed within EPSDT include "other diagnostic, screening, preventive, and rehabilitative services, including….any medical or remedial services (provided in a facility, a home, or other setting) recommended by a physician or other licensed practitioner of the healing arts within the scope of their practice under State law, for the maximum reduction of physical or mental disability and restoration of an individual to the best possible functional level." 42 U.S.C. § 1396d(a)(13).

46. RTF services, the therapeutic portion of therapeutic foster care, and other community-based mental and behavioral health services

prescribed by a medical professional, except for room and board, are covered EPSDT services.

47. Title XIX also requires that MA services "shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8).

48. DHS, in administering Pennsylvania's MA program, funds and arranges for the provision of certain mental and behavioral health services to children and adolescents up to the age of 21 who are enrolled in the MA program.

49. DHS contracts with the counties of the Commonwealth to arrange for the provision of medically necessary, MA funded, mental health services.

50. The counties, in turn, subcontract with managed care organizations (MCOs) to arrange for the provision of the MA-funded mental health services.

51. The MCOs contract with providers, including RTFs and community-based mental health agencies, to provide these services.

52. Title XIX requires DHS to ensure that it has contracted with MCOs that have the capability and capacity to appropriately serve all of their enrolled recipients, including children with mental health disabilities, for as long as the children continue to be eligible for and need the services.

53. In Pennsylvania, children and youth with disabilities are eligible for DHS's MA program without regard to their parents' income.  Thus virtually all, if not all, dependent children with disabilities in Pennsylvania are eligible for MA.

54. All Plaintiffs are eligible for MA.

55. When physicians or other licensed practitioners recommend particular mental health services for MA enrolled youth in Pennsylvania, it is the responsibility of DHS, through its contracted MCOs, to determine whether those services are medically necessary, and if so, to provide them.

56. As required by the ADA and RA, the mental health services must be provided in the most integrated setting appropriate to the needs of the youth.

## C.    Defendants' Unlawful Policies and Practices

57. The Child Welfare system in Pennsylvania serves over 23,000 children and youth.

58. Most dependent children are reunified with parents, adopted, placed with family members, or at least, placed in foster care.

59. Children without disabilities are more likely to receive these placements than children with mental health disabilities.

60. Defendants, through the Child Welfare system, do not provide adequate services and supports such that children with mental health disabilities can achieve stability and permanency at the same level as dependent children without disabilities.  Children with mental health disabilities do not have equal opportunities for reunification with parents, adoption, or placement with fit and willing relatives.

61. Defendants do not provide an adequate array of appropriate services and placements such that dependent children with mental health disabilities have equal opportunity for obtaining or maintaining foster care placements, including therapeutic foster care.

62.  Defendants fail to provide adequate access to medically necessary mental health services that are appropriate and effective for dependent children with mental health disabilities, including but not limited to community-based and trauma-informed mental health services, therapeutic foster care, and RTFs that are effective and limited in term.

63.  The Child Welfare system places children with mental health disabilities in institutions and congregate settings at higher rates than children without disabilities.

64. Defendants, through the Child Welfare system, do not provide an adequate array of appropriate services and placements to avoid

unnecessary placement of children with mental health disabilities in institutions and congregate settings.

65. As a result, most children with mental illness and behavioral health disabilities bounce among many placements – foster care placements, RTFs, and other institutions.

66.  As the number of placements increases, the more likely it is that these children will experience later placement disruptions.  Multiple placement disruptions can lead to, or exacerbate, behavioral problems, which leads to yet more instability and sometimes delinquency adjudications.

67. Children with mental health disabilities who may need time-limited institutional placements or for whom no other options are made available are often sent to a facility far away from their families and communities, even out of state, because Defendants do not provide an adequate array of appropriate services and placements to meet their needs.

68. In the Governor's Executive Budget for 2017-2018, Defendants have budgeted for 170 dependent children to be served in out of state placements.

69. Due to Defendants' failure to provide a Child Welfare system with an adequate array of appropriate services and placements, children with mental health disabilities are caught in a vicious cycle:

a.  Without adequate supports and services, children may bounce among multiple foster families in their early years.  Behavioral issues increase in this environment, and some children end up in the delinquency system and/or are placed in RTFs.

b. Children are left in RTFs far beyond the point that such services are needed or beneficial, because there is nowhere else for them to go.

c. Thus, there are a shortage of RTF "beds" for other children needing such placements or for which there are no alternative placements available.

d. To compound this problem, astonishingly, some of the RTFs that the Child Welfare system contracts with refuse to accept children with more significant mental illness and behavioral health problems, the very children they are designed to treat.

e. Children without alternatives waiting for RTF beds are in limbo because the RTFs are already filled with children waiting in limbo without discharge options.

70. As a result, because Defendants do not have an adequate system of services and placements for children with mental health disabilities, these children wait for long periods of time in inappropriate settings for "beds" to open up, for a placement willing to accept them, or for a placement to be developed.

71. For example, many dependent youth with mental and behavioral health diagnoses languish in acute psychiatric hospitals long after they are ready for discharge, paid for by the Child Welfare system or MA, because Defendants have no alternatives available.

72. Other dependent youth with mental and behavioral health diagnoses who are also adjudicated delinquent sit in juvenile detention centers for months – not because they are required to be there, but because they are waiting for Child Welfare or MA placements.

73. Because the deficiencies in the Child Welfare system are widespread and well known, evaluators recommending placements for dependent children with mental health disabilities may restrict their recommendations to what is known to be "available" in the system, rather than what is necessary, effective, and least restrictive for the child.

74. Similarly, children are often ordered into placements through delinquency court based on what the Child Welfare system has "available,"

rather than the Child Welfare system coming forward to the court with the most appropriate and least restrictive placement.

75. Finally, Defendants sometimes withdraw their Child Welfare services altogether from youth whose mental health disabilities lead to involvement with the delinquency system, leaving them essentially homeless.

76. Defendants are required to, but do not, develop sufficient services and placements to meet the needs of dependent children with mental health disabilities.

77. Within Pennsylvania, Defendants have failed to recruit and/or adequately train and support RTFs, therapeutic group homes, therapeutic foster homes, or other programs that have the capability and adequate capacity to accommodate the mental health needs of dependent children who need such services.

78. Defendants could take steps to provide needed services to, and avoid discriminating against, dependent children with mental health disabilities, including but not limited to:  1) developing additional community-based services to increase reunification, stability, and permanency for these children; 2) recruiting and offering specialized support and training to pre-adoptive homes, foster and therapeutic foster

care providers, and other community-based residential programs that would agree to serve these children, even the most challenging youth; 3) utilizing Defendants' complete service system, outside of Child Welfare, to locate appropriate services and residential programs for children, such as through its intellectual disability system for children with co-occurring disabilities; and 4) assuring that RTFs are effective, serving children with the most significant needs, and only as long as necessary.

79. Defendants could, but often choose not to, serve children and youth with mental health disabilities, such as Plaintiffs, in small homes with trained staff, integrated into their home communities.

80. Children with mental health disabilities suffer greatly due to these failures, including regression in their mental health, poor school outcomes, and increased risk of homelessness and juvenile and criminal justice involvement.  These children often depart from the Child Welfare system without family or community connections.

**D.    S.R.**

81. S.R. is a ten-year-old boy from Beaver County, Pennsylvania.

82. S.R. is diagnosed with bipolar disorder, post-traumatic stress disorder (PTSD), mood disorder, attention deficit hyperactivity disorder (ADHD), and mild intellectual disability (ID).

83. S.R. was removed from his parents and taken into the custody of the Child Welfare system when he was five years old due to physical abuse and lack of proper supervision.

84. Following placement in various foster homes and inpatient hospitalization programs, he was placed at The Bradley Center, a RTF on July 29, 2014.

85. S.R. was seven-years-old when he was first placed at The Bradley Center. Three and a half years later, he is still there.  The Bradley Center feels he has benefited all he can from their program.

86. At his most recent permanency review hearing, which occurred on September 29, 2017, the county Child Welfare agency reported that S.R. has made "a great deal of progress," has improved relationships with peers, has improved in his ability to process behaviors and accept responsibility, and has earned community outings where he behaved "remarkably well."

87. The agency's placement goal for S.R. is adoption.

88. At the September 29, 2017 permanency review hearing, the Juvenile Court noted S.R.'s wishes: "He wants to find a family."

89. About a year ago, the agency explored a possible Community Residential Rehabilitation (CRR) placement for S.R. but to no avail.

90. The agency is now looking to transfer S.R. to another RTF, possibly one that is out of state.

### E.   Theodore (Teddy) Smith

91. Teddy Smith is an eighteen-year-old young man from Philadelphia County, Pennsylvania.

92. At all relevant times, Teddy was enrolled in DHS's MA program and received his behavioral health MA services (other than those provided in delinquent facilities) through Community Behavioral Health (CBH), the MCO which contracts with DHS to provide such services in Philadelphia County.

93. Teddy has been diagnosed with a number of mental illnesses, including schizo-effective disorder, bipolar disorder, impulse control disorder (ICD), and PTSD resulting from years of childhood abuse, as well as a seizure disorder.

94. Teddy hears voices at times, and has difficulty controlling his anger due to his PTSD and impulse control disorder.

95. Teddy was adjudicated delinquent on the basis of assault charges occurring before his eighteenth birthday.

96. At the age of seventeen, Teddy was also adjudicated to be a dependent child due to abuse by his family, and was placed at a RTF.

97. In March of 2017, Teddy ran away from the facility, was arrested and placed at the Philadelphia Juvenile Justice Services Center (JJSC).

98. The JJSC is managed and operated by the Child Welfare agency in Philadelphia.

99. In or around March 2017, at the Child Welfare system's request, the family court terminated Teddy's dependency case citing as a reason that he was adjudicated delinquent.

100. In or around April 2017, Teddy was evaluated by a psychiatrist who recommended that he receive services in a secure RTF.

101. CBH made referrals to some RTFs but those RTFs refused to accept T.S.

102. In late summer 2017, CBH informed Teddy's probation officer that it would no longer be seeking a placement for him.  It simply gave up.

103. In August 2017, Teddy was reevaluated, and the evaluator recommended that he be provided "trauma informed care" in a structured residential setting.

104. One week later, with no placement or treatment option having been offered by CBH in the previous four months, and none expected, the court ordered Teddy to Loysville Youth Development Center (LYDC), a facility for delinquent youth operated by Defendants.

105. Less than two weeks after his arrival at LYDC, Teddy was physically assaulted by multiple LYDC staff.  While he was sitting still, one staff grabbed him by his shirt and banged his head against a wall and then three others tackled him and dragged him to another room.  He was tackled two more times over the next 20 minutes or so by men each weighing in excess of three hundred pounds, leaving him unconscious for several minutes.

106. At the end of the above described incident, LYDC staff called the police, accused Teddy of assaulting staff, and had him arrested as an adult.

107. Teddy spent approximately two months in the Perry County jail before a video of the incident revealed the truth and the Perry County District Attorney dropped all charges against him.

108. On or about November 3, 2017, Teddy was returned to the JJSC in Philadelphia, where he remains.

109. Teddy experienced headaches and eye twitches since the assault at LYCD.

110. Teddy is in need of appropriate mental and behavioral health services in the most integrated setting appropriate to his needs.

111. On information and belief, in early November 2017, CBH again informed Teddy's probation officer that they have no services for him.

112. Teddy wishes to have his dependency status reinstated so that he can access services from the Child Welfare system.

113. Teddy's dependency status would be restored if the Child Welfare system had any appropriate services and placements to offer him.

**F.     S.H.**

114. S.H. is a fifteen-year-old girl from Philadelphia, Pennsylvania who has been diagnosed with numerous mental illnesses including bipolar disorder, PTSD, ADHD, mood disorder, oppositional defiant disorder (ODD), and ICD, with a history of hospitalization for attempted suicide.

115. S.H. was sexually abused at the age of five.

116. S.H. was adjudicated dependent in 2012 at the age of ten.

117. In October of 2016, S.H. was adjudicated delinquent on a simple assault charge and placed on probation.  She violated her probation and was placed at the JJSC in March of 2017.

118. In March 2017, and again in November 2017, S.H. was evaluated by a psychiatrist who recommended that she be placed at an RTF and receive trauma therapy.

119. At the request of the county Child Welfare agency, the court terminated S.H.'s dependency petition due to her delinquent adjudication.

120. In 2017, at the request of S.H.'s attorney, the court reinstated S.H.'s dependency case.

121. S.H. has served many months more in detention than her simple assault charge would ever have warranted.  The delinquency court has been willing to close her delinquency case and release her.  However, she is awaiting an RTF placement from Defendants, as that is what was determined to be medically necessary by the psychiatrist who evaluated her, so she is being held at the JJSC.

122. Defendants, through its Child Welfare and MA systems, have not provided a placement for S.H.

123. After nine months in detention simply for lack of a safe and appropriate place to live and receive treatment, Defendants have failed to provide appropriate Child Welfare services and medically necessary mental health services in the less restrictive setting for S.H.

124.  S.H. is at risk of being sent to a facility in Virginia hours away from anyone she knows, because "no one else will accept her" in Pennsylvania.

### G.    Chrystal Steward

125. Chrystal is a nineteen-year-old young woman from Philadelphia, Pennsylvania, who has been diagnosed with ADHD, adjustment disorder, intermittent explosive disorder, PTSD, and intellectual disability.

126. Chrystal was adjudicated dependent in 2008.

127. Chrystal was sent to Belmont Behavioral Health (Belmont), an acute inpatient psychiatric hospital, in November of 2016.

128. Belmont is an inpatient facility where children and adults can receive acute mental health services.  Patients are generally stabilized and ready for discharge to home or less restrictive settings within a few weeks. Continued placement in such a setting is detrimental to patients' mental health.

129. Within weeks of her admission to Belmont, Chrystal's doctors determined that she was ready to be discharged.

130. Defendants have not provided any RTF or other placement willing to accept her, so she has remained at Belmont for the past year. She has nowhere else to go.

131. Chrystal's condition has been exacerbated by her inappropriate confinement in a psychiatric hospital surrounded by acutely mentally ill

patients for months on end.  She has limited privileges at the hospital, including limited access even to go outside in the fresh air.

132.  At least fifteen dependent children, including Plaintiff Chrystal Steward, are waiting for appropriate services and placements at Belmont, many for several months or up to a year.

133. Belmont has had so many children who end up staying beyond discharge with no place to go, it is changing one of its adult units to an additional children's unit.

H.    N.C.

134. N.C. is a fifteen-year-old boy from York, Pennsylvania who has bipolar disorder, PTSD, ADHD, and borderline intellectual disability.

135. N.C. has a history of being physically abused and neglected as a child.  He no longer has any contact with his parents.

136. He was adjudicated dependent at the age of 5.

137. N.C. has been in many placements in the last ten years - foster care, RTFs, and inpatient psychiatric facilities.  He has not attended regular school since 6th grade.

138. He was adjudicated delinquent around the age of 12, and has been involved with probation on and off since then.

139. He was placed at LYDC in December of 2016.  He was discharged in June of 2017 to an RTF.

140. N.C. had to leave the RTF because of a bed bug infestation, so he was transferred to the York Detention Center pending placement through Child Welfare.

141. His mental health deteriorated, and he was admitted to the psychiatric unit of a county hospital.  Even after he was ready for discharge, he had to remain for weeks because the Child Welfare and MA systems provided no services or placement for N.C. outside of the hospital.

142. The county office of the Child Welfare system could not provide a placement for N.C. after a county-wide and state-wide search.

143. Although N.C. no longer required incarceration through the delinquency system and he was on good status with the juvenile probation office, he was court ordered to LYDC again because the Child Welfare system had no placement for him.

144. N.C.'s mental health deteriorated at LYDC.  He was inappropriately subjected to restraints by staff there for manifestations of his disability.

145. Defendants have entered into an interstate agreement with an agency of the Commonwealth of Virginia so that N.C. can be sent out-of-

state to a facility in Virginia.  He was scheduled to leave on December 13, 2017.

I.    **M.T.**

146. M.T. is a sixteen-year-old boy from Philadelphia who has been diagnosed with autism spectrum disorder, PTSD, conduct disorder, and obsessive compulsive disorder.  He has a history of disability-related elopement.

147. M.T. has been witness to violence on a number of occasions and suffered carbon monoxide exposure in a fire as a young child.

148. M.T. has been adjudicated dependent for years.

149. Around March 2016, M.T. was adjudicated delinquent on a conspiracy to commit arson charge.  At the time of the incident, M.T. was being bullied at school and threatened by peers that he would be "jumped" if he did not set a fire.

150. An August 2017 psychiatric evaluation notes that M.T. tends to be trusting and not question what peers might ask him to do due to the need to be accepted by peers.

151. After going between a family member's home and a group home, M.T. was admitted to a psychiatric hospital after he eloped and

engaged in alleged property destruction, where he remained from January 19, 2017 to April 7, 2017.

152.   In April 2017, he was moved to the JJSC.

153. In August 2017, a psychiatric evaluation concluded that he needed an RTF placement with appropriate services.

154. Defendants, through the Child Welfare and MA systems, have not provided services and placement for M.T. outside of JJSC.

155. M.T. has now spent eight months at JJSC awaiting Child Welfare services and medically necessary mental health services.

156. M.T. is at serious risk of being sent out-of-state, potentially as far away as Arkansas.

**Class Action Allegations**

157. Named Plaintiffs, through their next friends, bring this lawsuit on behalf of themselves and all other Pennsylvania children and youth under the age of twenty-one who, now or in the future, are adjudicated dependent and have diagnosed mental health disabilities.

158.   The size of the class makes joinder impracticable.  There are over 23,000 thousand dependent youth in Pennsylvania.  About twenty percent of adolescents in the general population have a diagnosed mental health disability.  Research has consistently found that dependent children

have higher rates of mental health disabilities than do children in the general population.  Thus, the number of potential class members is in the thousands.  In addition, the class includes future children who meet the class definition.

159. There are questions of fact and law common to class members, including, but not limited to:

   a. whether Defendants provide a sufficient array of services and placements through the Child Welfare system to meet the needs of dependent children with mental health disabilities, such as therapeutic foster care placements, respite, and community living arrangements;

   b. whether Defendants' MA program fails to provide medically necessary mental and behavioral health services with reasonable promptness or at all to the class, such as individual and family-based mental health services, behavioral health rehabilitation services, and access to in-state RTFs;

   c. whether Defendants have a policy and/or practice of leaving dependent children with mental health disabilities in limbo in RTFs past the point they are ready for discharge because there

are no alternative, more integrated, less restrictive placements available;

d.  whether Defendants have a policy and/or practice of recommending to family court that youth remain in juvenile justice facilities when Defendants do not have an appropriate placement available;

e.  whether Defendants have a policy and/or practice of entering into contracts to send children out of state, rather than developing additional community-based services and placements for dependent children who are determined to have "nowhere to go";

f.  whether Defendants have policies and practices that discriminate against the class by: i) on the basis of their disabilities, failing to provide an adequate array of appropriate Child Welfare and MA services that provides class members equal access to reunification, stability, and permanency as dependent youth without disabilities or at all; and ii) failing to provide an adequate array of Child Welfare and MA services and placements so that class members are served in the most integrated settings appropriate to meet their needs; and

g.  whether the above described policies and practices violate Title XIX, the ADA, and/or the RA.

160.  The claims of the named Plaintiffs are typical of those of all putative class members.  Named Plaintiffs are youth with mental health disabilities who were adjudicated dependent due to abuse or neglect. Plaintiffs are currently stuck in inappropriate and overly restrictive institutional settings due to Defendants' failures to provide them with appropriate residential and mental health services and supports.  Putative class members are either in similar situations or are at risk of being so due to the lack of services and placements available from Defendants.

161. The named Plaintiffs will adequately protect the interests of the class.  They have no interests which conflict with other class members. Plaintiffs' counsel are experienced in litigating class actions including enforcement of Title XIX, the ADA, and the RA.

162. Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate injunctive and declaratory relief with respect to the class as a whole.

## COUNT I

### Violation of Title XIX by Defendant Miller
### Failure to Make EPSDT Services Available

163. Paragraphs 1 through 152 are incorporated by reference.

164. Title XIX of the Social Security Act requires that states participating in the Medical Assistance program must make Medical Assistance benefits available.  42 U.S.C. § 1396a(a)(10)(A).  For persons under 21, this includes providing or arranging for the provision of Early and Periodic Screening, Diagnosis and Treatment ("EPSDT") services.  42 U.S.C. § 1396a(a)(43)(C) and § 1396d(a)(4)(B).

165. EPSDT services are services that are necessary to correct or ameliorate "defects and physical or mental illnesses or conditions." See 42 U.S.C. § 1396d(a) and (r)(5).

166. EPSDT services include, among other things, "diagnostic, screening, preventive, and rehabilitative services, including …. any medical or remedial services (provided in a facility, a home, or other setting) recommended by a physician or other licensed practitioner of the healing arts within the scope of their practice under State law, for the maximum reduction of physical or mental disability and restoration of an individual to the best possible functional level." 42 U.S.C. § 1396d(a)(13).

167. RTF services, the therapeutic portion of therapeutic foster care, and other community-based behavioral health services prescribed by a medical professional, except for room and board, are covered EPSDT services.

168. Plaintiffs need residential and/or community-based behavioral health services for the maximum reduction of their mental disabilities and restoration to their best possible functional levels.

169. Defendant Miller has failed to make available the EPSDT services to which Plaintiffs and class members are entitled, in violation of 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(C), and 1983.

## COUNT II

### Violation of Title XIX by Defendant Miller
### Failure to Ensure that Timely Assistance is Provided

170. Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

171. Under Title XIX of the Social Security Act, the state MA program is required to furnish Medical Assistance with reasonable promptness to all eligible individuals.  42 U.S.C. § 1396a(a)(8).

172. Defendant is failing to ensure that Medical Assistance is furnished to Plaintiffs and class members with reasonable promptness in violation of 42 U.S.C. § 1396a(a)(8) and its implementing regulations.

## COUNT III

### Violation of the ADA by Defendant Miller
### and the RA by Defendant DHS

173. Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

174. Plaintiffs have mental impairments that substantially limit one or more major life activities including thinking, caring for themselves, and interacting with others, and are otherwise qualified "individuals with a disability" within the meaning of the ADA, 42 U.S.C. § 12131(2) and Section 504 of the RA, 29 U.S.C. § 794, and its implementing regulations, 28 C.F.R. §§ 41.31 and 41.32.

175. DHS is a public entity within the meaning of the ADA, 42 U.S.C. § 12131(1).

176. DHS is a recipient of federal financial assistance that operates programs or activities within the meaning of Section 504 of the RA, 29 U.S.C. § 794(b).

177. Defendant Miller subjects Plaintiffs to discrimination by reason of their disabilities in violation of the ADA, 42 U.S.C. § 12132, and its implementing regulations at 28 C.F.R. § 35.130.

178. Defendant DHS subjects Plaintiffs to discrimination solely by reason of their disabilities in violation of Section 504 of the RA, 29 U.S.C. § 794.

179. More specifically, Defendants, in overseeing the provision of Child Welfare services in Pennsylvania, through their funding mechanisms and arrangements with counties, on the basis of disability, or the severity of disability, unlawfully:

    a. Deny Plaintiffs the opportunity to participate in and benefit from publicly funded Child Welfare services, including but not limited to foster homes and group homes;

    b. Afford Plaintiffs opportunities to participate in or benefit from publicly funded Child Welfare services that are not equal to that afforded others;

    c. Provide Plaintiffs publicly funded Child Welfare services that are not as effective as those provided to others; and,

    d. Limit Plaintiffs in the enjoyment of the rights, privileges, advantages, and opportunities enjoyed by others receiving its Child Welfare services, including family visits and reunification services, stability and permanency, community-based services and placements, and appropriate treatment.

28 C.F.R. 35.130(a) and (b)(1)(i-ii, and vii); 28 C.F.R. § 41.51(b)(1)(i-iii and v), 45 C.F.R. § 84.4(b)(1)(i-iii, and vii) and § 84.52(a).

180. Defendants also aid and perpetuate discrimination against Plaintiffs by providing significant assistance to county Child Welfare agencies which discriminate against them.  28 C.F.R. § 35.130(b)(1)(v); 28 C.F.R. § 41.51(b)(1)(v); 45 C.F.R. § 84.4(b)(1)(v).

181. Defendants unlawfully utilize methods of administration that

    a.  Have the effect of subjecting Plaintiffs to discrimination on the basis of their disabilities or severity of their disabilities; and,

    b.  Have the effect of defeating or substantially impairing and/or defeating accomplishment of the objectives of its publicly funded Child Welfare system with respect to Plaintiffs. 28 C.F.R. § 35.130(b)(3); 28 C.F.R. § 41.51(b)(3)(i) and (ii), 45 C.F.R. § 84.4(b)(4).

182. Defendants have failed to make reasonable modifications in policies, practices and procedures when necessary to avoid discrimination even though such modifications would not fundamentally alter the nature of their services.  28 C.F.R. § 35.130(b)(7); 28 C.F.R. § 41.53.

183. In serving Plaintiffs in restrictive institutions, Defendants unlawfully fail to administer the Child Welfare program and the MA program

in the most integrated settings appropriate to Plaintiffs' needs.  28 C.F.R. §

35.130(d); 28 C.F.R. § 41.51(d), 45 C.F.R. § 84.4(b)(2).

184. Plaintiffs are being injured by Defendants' actions and

omissions.

## PRAYER FOR RELIEF

**WHEREFORE**, named Plaintiffs, by their next friends, respectfully

request that judgment be entered in their favor and against Defendants,

together with the following relief:

    a.  Exercise jurisdiction over this case;

    b.  Issue declaratory relief determining that Defendants' actions

       and omissions as described above violate Title XIX of the

       Social Security Act, the ADA, and the RA;

    c.  Issue injunctive relief requiring Defendants to develop a full

       array of appropriate Child Welfare and MA services and

       placements to meet the needs of children with mental illness

       and behavioral health disabilities in the most integrated

       settings appropriate to their needs; and,

41

d.  Grant such other relief as may be appropriate, including

awarding reasonable attorneys' fees and costs.


By:   /s/ Kelly Darr

DISABILITY RIGHTS PENNSYLVANIA
Kelly Darr, PA 80909
Shanon Levin, PA 86040
Rachel Mann, PA 49267
Gabriella Labella, PA 87858
1315 Walnut Street, Suite 500
Philadelphia, PA  19107-4798

kdarr@disabilityrightspa.org
(215) 238-8070
(215) 772-3126 (fax)

Jeni Hergenreder, PA 208282
429 Fourth Avenue, Suite 701
Pittsburgh, PA
(412) 391-5225
(412) 467-8940 (fax)

Attorneys for Plaintiff

Dated:  December 18, 2017