## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| S.R., by and through his next friend, Phillip Rosenbauer, THEODORE SMITH, by and through his next friend, Ashley Maddison, S.H., by and through her next friend, Julia Shmilovich, M.T., by and through his next friend, Ashley Maddison, N.C., by and through his next friend, Sue Walther, CHRYSTAL STEWARD, by and through her next friend, Deborah Fegan, on behalf, of themselves and all others similarly situated, | : | 1:17-cv-2332 |
| | : | |
| | : | Hon. John E. Jones III |
| Plaintiffs, | : | |
| v. | : | |
| PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES and TERESA , MILLER, in her capacity as Secretary of the Department of Human Services, | : | |
| Defendants, | : | |

## MEMORANDUM & ORDER

### March 23, 2018

Presently pending before the Court is the Defendants' motion to dismiss.

(the "Motion") (Doc. 15). On April 3, 2018, we granted Plaintiffs' motion for class

certification. (Doc. 22). Plaintiffs represent a class of all Pennsylvania youth under

the age of 21 who, now or in the future, are adjudicated dependent and have

diagnosed mental health disabilities. ("Plaintiffs") (Doc. 22).  Plaintiffs bring three

claims against Defendants Pennsylvania Department of Human Services ("DHS")
and Teresa Miller, as Acting Secretary of the DHS (collectively, Defendants),
alleging systemic failures in the Pennsylvania Child Welfare and Medical
Assistance programs. (Doc. 1). Defendants filed the instant Motion on February
26, 2018. (Doc. 15). The Motion has been fully briefed and is therefore ripe for our
review. (Docs. 16, 18, 25). For the reasons that follow, the Motion shall be denied.

## I.    BACKGROUND

On December 18, 2017, Plaintiffs commenced this action, by and through
their next friends, on behalf of themselves and all others similarly situated. (Doc.
1). On April 3, 2018, we granted Named Plaintiffs' motion for class certification,
certifying all three claims within the complaint as class claims on behalf of all
Pennsylvania youth under the age of 21 who are adjudicated dependent and
diagnosed with mental health disabilities. (Doc. 22). The complaint alleges that
DHS has failed to provide the required appropriate services to dependent children
with diagnosed mental health disabilities in Pennsylvania. In accordance with the
legal standard applicable on a motion to dismiss, the following facts are derived
from the complaint.

DHS, through the Child Welfare system and its Office of Medical
Assistance Programs ("Medical Assistance"), is responsible for providing
appropriate mental health care. (*Id.* at ¶ 3). The complaint paints a picture of the

sad reality for various dependent youths in Pennsylvania. Many dependent children with mental disabilities end up in large, congregate facilities for years while they wait for appropriate placement from DHS. (*Id*. at ¶ 4). Others end up waiting for months or years in inappropriate settings, such as psychiatric hospitals, juvenile detention facilities, and residential treatment facilities ("RTFs") while they wait for placement from DHS. (*Id*. at ¶ 5). Each of the named Plaintiffs in this action has been diagnosed with mental health disabilities and has been adjudicated dependent. (*Id*. at ¶ 9). They are all eligible for medical assistance from DHS. (*Id*. at ¶ 54).

Plaintiff S.R. is a ten year old dependent child with mental health disabilities. (*Id*. at ¶ 10). He has been in a RTF waiting for placement from DHS for over three years. (*Id*.). His psychiatrist notes "lack of discharge options" as a barrier to his treatment. (*Id*. at ¶ 10). Though the RTF feels that S.R. has maximized his treatment and plans to discharge him when he has been assigned placement, DHS has not provided an appropriate family or community-based placement for S.R. with adequate services. (*Id*.).

Plaintiff Teddy Smith is an eighteen year old with mental illnesses who spent several months unnecessarily in a juvenile detention center awaiting an appropriate placement from DHS. (*Id*. at ¶ 11). When Smith was moved to a secure state-operated youth development center, he was assaulted by staff within the first two weeks. (*Id*.). Plaintiffs S.H., a fifteen year old with mental illnesses, and M.T.,

a sixteen year old with mental illness, are in the same local juvenile detention center awaiting services from Medical Assistance and a place to live from Child Welfare. (*Id*. at ¶ 12). Both S.H. and M.T. have been in the juvenile detention center for more than 200 days waiting for appropriate placement and services. (*Id*.).

Plaintiff N.C. is a fifteen year old boy diagnosed with mental illness and has bounced around foster care and institutions for years while waiting for appropriate placement from DHS. (*Id*. at ¶ 13). He was scheduled to be sent to an out-of-state placement on December 13, 2017 because DHS provided no services or placement in Pennsylvania. (*Id*.). Plaintiff Chrystal Steward, a nineteen year old diagnosed with mental illnesses, is waiting in a psychiatric hospital for placement. (*Id.* at ¶ 14). Although she has been ready for discharge for nearly one year, she has not been discharged because DHS has not given her an appropriate placement. (*Id*.).

Plaintiffs bring three counts against Defendants, on behalf of themselves and others similarly situated. Counts I and II are brought pursuant to 42 U.S.C. § 1983. ("Section 1983"). In Count I, Plaintiffs allege that Defendants have violated Title XIX of the Social Security Act ("Title XIX" or the "Medicaid Act"), 42 U.S.C. § 1396a(a)(10)(A) and 1396a(a)(43)(C). Title XIX, Section 1396a(a)(10)(A) requires a state plan for medical assistance to "provide for making medical assistance available" to a list of enumerated eligible individuals. Section 1396a(a)(43)

4

requires the state plan to "provide for informing all persons in the State who are under the age of 21 and who have been determined to be eligible for medical assistance . . . of the availability of early and periodic screening, diagnostic, and treatment services." Section 1396a(a)(43)(C) requires the plan to provide for arranging those Early and Periodic Screening, Diagnosis and Treatment ("EPSDT") services.

In Count II, Plaintiffs allege that Defendants have violated Title XIX, Section 1396a(a)(8), which requires a state plan for medical assistance to "provide that all individuals wishing to make application for medical assistance under the plan shall have the opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." In Count III, Plaintiffs allege that Defendants have violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(2), Section 504 of the Rehabilitation Act ("Section 504" or "RA"), 29 U.S.C. § 794, and their respective implementing regulations. Plaintiffs allege that the Defendants' policies and practices fail to provide them with mental health services in the most integrated setting appropriate, and fail to afford equal access to other services to achieve stability and permanency based on their disabilities or the severity of their disabilities.

Plaintiffs request that the Court "[i]ssue declaratory relief determining that Defendants' actions and omissions as described above violate Title XIX of the

Social Security Act, the ADA, and the RA," "[i]ssue injunctive relief requiring Defendants to develop a full array of appropriate Child Welfare and MA services and placements to meet the needs of children with mental illness and behavior health disabilities in the most integrated settings appropriate to their needs," and "[g]rant such other relief as may be appropriate, including awarding reasonable attorneys' fees and costs." (Doc. 1, pp. 41-42).

## II.    LEGAL STANDARD

In considering a motion to dismiss pursuant to Rule 12(b)(6), courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In resolving a motion to dismiss pursuant to Rule 12(b)(6), a court generally should consider only the allegations in the complaint, as well as "documents that are attached to or submitted with the complaint, . . . and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirement of Rule 8(a).  Rule 8(a)(2) requires that a complaint contain a

short and plain statement of the claim showing that the pleader is entitled to relief, "in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint attacked by Rule 12(b)(6) motion to dismiss need not contain detailed factual allegations, it must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a civil plaintiff must allege facts that "raise a right to relief above the speculative level…." *Victaulic Co. v. Tieman*, 499 F.3d 227, 235 (3d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Accordingly, to satisfy the plausibility standard, the complaint must indicate that defendant's liability is more than "a sheer possibility." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Under the two-pronged approach articulated in *Twombly* and later formalized in *Iqbal*, a district court must first identify all factual allegations that constitute nothing more than "legal conclusions" or "naked assertions." *Twombly*, 550 U.S. at 555, 557. Such allegations are "not entitled to the assumption of truth" and must be disregarded for purposes of resolving a 12(b)(6) motion to dismiss.

*Iqbal*, 556 U.S. at 679.  Next, the district court must identify "the 'nub' of the …

complaint – the well-pleaded, nonconclusory factual allegation[s]."  *Id.*  Taking

these allegations as true, the district judge must then determine whether the

complaint states a plausible claim for relief.  *See id.*

However, "a complaint may not be dismissed merely because it appears

unlikely that the plaintiff can prove those facts or will ultimately prevail on the

merits."  *Phillips,* 515 F.3d at 231 (citing *Twombly*, 550 U.S. at 556-57).  Rule 8

"does not impose a probability requirement at the pleading stage, but instead

simply calls for enough facts to raise a reasonable expectation that discovery will

reveal evidence of the necessary element."  *Id.* at 234.

### III.    DISCUSSION

Defendants move to dismiss all three of Plaintiffs' claims for the same

reason – the relevant statutory frameworks do not provide Plaintiffs with privately

enforceable rights. We will begin with a discussion of the analytical framework we

must use to determine whether a statute or regulation grants privately enforceable

rights to citizens, and then discuss each relevant statutory framework on which

Plaintiffs rely in their complaint.

### A. Privately Enforceable Rights

Section 1983 provides a remedy for violations of federal rights, but not

merely for violations of any federal law. *Blessing v. Freestone*, 520 U.S. 329, 341

(1997). A plaintiff must therefore assert a violation of a federal right to seek redress under § 1983. In *Blessing*, the Supreme Court identified three factors that courts should consider when determining whether a statute confers a privately enforceable federal right under § 1983. First, Congress must have intended the provision in question to benefit the plaintiff. *Blessing*, 520 U.S at 341. Second, the plaintiff must demonstrate that the right is not so "vague and amorphous" that its enforcement would strain judicial competence. *Id.* at 340-41. Third, the statute must unambiguously impose a binding obligation on the states. *Id.* at 341.

The Court clarified the *Blessing* test in *Gonzaga Univeristy v. Doe*, and explained that *Blessing* does not permit enforcement of a statute under § 1983 when a plaintiff merely "falls within the general zone of interest that the statute is intended to protect." *Gonzaga Univeristy v. Doe*, 536 U.S. 273, 283 (2002). "[I]it is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of" § 1983. *Id.* (emphasis in original). A right must therefore be "unambiguously conferred" by Congress to support a cause of action under § 1983. *Id.*

The Third Circuit has interpreted *Gonzaga* as setting forth a two-part test for determining whether a statute confers a privately enforceable right. *See Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel*, 570 F.3d 520, 527 (3d Cir. 2009). Courts must first apply the three factors of the *Blessing* test. *Id.* Then, courts must

determine whether the statutory provision in question unambiguously confers a substantive right, as set forth in *Gonzaga*. *Id.* To find that the statute unambiguously confers a substantive right, the court must conclude that the statute contains "rights-creating language which clearly imparts an individual entitlement with an 'unmistakable focus on the benefitted class.'" *Id.* at 526 (quoting *Sabree v. Richman*, 367 F.3d 180, 187 (3d Cir. 2004)). In *Sabree*, the Third Circuit found that a Medicaid statute that required that a state "must provide" certain medical services contained rights-creating language. 367 F.3d at 190. The Third Circuit explained that the "must provide" language is "mandatory rather than precatory," and thus clearly reveals Congress's intent to confer federal rights. *Id.*

### B. Title XIX, Sections 1396a(a)(10)(A) and 1396a(a)(8)

As aforementioned, Plaintiffs rely on Section 1396a(a)(10)(A) of Title XIX in Count I of their complaint against the Defendants. This provision, which we will refer to as the "entitlement mandate," requires a state plan for medical assistance to "provide for making medical assistance available" to a long list of eligible categories of individuals. 42 U.S.C. § 1396a(a)(10)(A). In Count II, Plaintiffs rely on Section 1396a(a)(8), which we will refer to as the "reasonable promptness mandate," which requires a state plan for medical assistance to "provide that all individuals wishing to make application for medical assistance under the plan shall have the opportunity to do so, and that such assistance shall be furnished with

reasonable promptness to all eligible individuals." 42 U.S.C. 1396a(a)(8). The

Third Circuit has already considered whether these provisions of the Medicaid Act

confer rights enforceable pursuant to Section 1983 in *Sabree v. Richman*, 367 F.3d

180 (2004), holding that they do indeed create private rights. Because Defendants

argue that subsequent case law requires a different holding, we begin with a

discussion of the Third Circuit's analysis in *Sabree*.

In *Sabree*, the Third Circuit considered claims brought by a class of mentally

challenged adults in need of medical services. *Id*. at 181. Though the plaintiffs

qualified for state assistance under the Medicaid Act, that assistance had not been

forthcoming. *Id*. Plaintiffs brought suit pursuant to Section 1983, alleging

violations of three provisions of Title XIX, including the entitlement mandate and

the reasonable promptness mandate. (*Id*.). The Court meticulously analyzed the

provisions, consulting the *Gonzaga* and *Blessing* frameworks, and held that

"Congress clearly and unambiguously conferred the rights of which plaintiffs have

allegedly been deprived by Pennsylvania, and has not precluded individual

enforcement of those rights." *Id*. at 194.

The Court began with the text of the entitlement and reasonable promptness

mandates, noting that both provisions begin with a declaration that the State "must

provide" medical assistance to eligible individuals and with reasonable

promptness. *Id*. at 189. The Court stated, "[i]n each of these provisions, the

statutory language is clear and unambiguous. Indeed, we can hardly imagine anyone disputing that a state must provide the assistance necessary to obtain [] services, and that it must do so with 'reasonable promptness.'" *Id*. The inquiry cannot end there, however, as the Court noted that "[i]ndisputably, these provisions create law," but whether they confer private rights "is another question." *Id*.

The Court went on to apply the *Blessing* test,

> Without difficulty, we conclude that these provisions satisfy the *Blessing Test* because: (1) plaintiffs were the intended beneficiaries of §§ 1396a(a)(10), 1396d(a)(15), and 1396a(a)(8); (2) the rights sought to be enforced by them are specific and enumerated, not 'vague and amorphous'; and (3) the obligation imposed on the states is unambiguous and binding.

*Id*. Next, the Court followed the instruction of *Gonzaga* and examined the statute "[t]o ensure that Congress unambiguously conferred the rights asserted" with "rights-creating terms." *Id*. at 190 (*quoting Gonzaga*, 536 U.S. at 284). In *Gonzaga*, the Supreme Court "identified the text of Titles VI and IX as exemplars of rights-creating language." *Id*. (*citing Gonzaga*, 536 U.S. at 287). Titles VI and IX begin with the language "no person shall." *Gonzaga*, 536 U.S. at 287. Comparing those statutes with Title XIX, the *Sabree* court stated,

> [W]e find it difficult, if not impossible, as a linguistic matter, to distinguish the import of the relevant Title XIX language – "A state plan must provide" – from the "No person shall" language of Titles VI and IX. Just as in Titles VI and IX, the relevant terms used in Title XIX are 'mandatory rather than precatory.'[1] Further, the 'individual

---

[1] *Blessing*, 520 U.S. at 341.

focus' of Sections 1396a(a)(10), 1396d(a)(15), and 1396a(a)(8) is unmistakable.[2] The relevant Title XIX provisions enumerate the entitlements made available to 'all eligible individuals.'[3] The provisions do not focus on 'the [entity] . . . regulated rather than the individuals protected.'[4] Neither do the statutory references to the individual appear 'in the context of describing the type of 'policy or practice' that triggers a funding prohibition.'[5]

*Sabree*, 367 F.3d at 190 (internal citations omitted from quote and included in footnotes). Concluding that the provisions "conferred specific entitlements on individuals" in clear terms without ambiguity, the Court determined that it "need not look further to determine congressional intent." *Id*. Recognizing the holistic endeavor of statutory construction, however, the Court went on to analyze the structure of the Medicaid Act. *Id*.

Title XIX, Section 1396 opens with an explanation that it was enacted "[f]or the purpose of enabling each State . . . to furnish . . . medical assistance." 42 U.S.C. § 1396. Section 1396c provides for funding to be withheld if the State fails to "comply substantially" with the requirements of Title XIX. 42 U.S.C. § 1396c. The Court recognized that these provisions said nothing of individual entitlements or rights, and "confirms that Title XIX by its terms creates a relationship between Congress and a particular state." *Sabree*, 367 F.3d at 191-192. The Court further acknowledged that, "[o]f course, in *Blessing* and *Gonzaga University*, such

---

[2] *Gonzaga*, 536 U.S. at 287.
[3] *See, e.g.*, 42 U.S.C. § 1396a(a)(8).
[4] *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001).
[5] *Gonzaga*, 536 U.S. at 288.

language counseled against the recognition of an unambiguously conferred right." *Id*. at 192. However, though these structural elements of Title XIX did give the Court "some pause," the Third Circuit concluded that "Section 1396, the appropriations and general introductory statement, cannot neutralize the rights-creating language of Sections 1396a(a)(10), 1396d(a)(15), and 1396a(a)(8)." *Id*.

 *Sabree* is directly applicable to the case at-bar, and would compel our denial of the Motion as it seeks to dismiss Plaintiffs' claims relying on the entitlement and reasonable promptness mandates. However, Defendants argue that the Supreme Court's decision in *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015) undermines the reasoning of *Sabree* and requires our reconsideration of *Sabree*'s holdings. (Doc. 16, pp. 10-13). We disagree.

 *Armstrong* involved a challenge by Medicaid providers to enforce Section 1396a(a)(30)(A) ("Section 30(A)") of the Medicaid Act. 135 S. Ct. at 1382. Section 30(A) requires state plans to "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area...." 42

U.S.C. § 1396a(a)(30)(A). The Court held that this provision did not include an implied right of individual action. *Armstrong*, 135 S. Ct. at 1387.

The Court observed that the provision "lacks the sort of rights-creating language needed to imply a private right of action." *Id*. The Court noted that the provision is phrased as a directive to the federal agency – the Medicaid Act provides that the Secretary "shall approve" any plan that fulfills the requirements of subsection (a), which includes Section 30(A). *Id.* Such language, the Court explained, does not reveal congressional intent to create a private right of action. *Id*. Though this "shall approve" language is also applicable to the entitlement and reasonable promptness mandates, the Third Circuit has already concluded in *Sabree* that these provisions *do* contain other rights-creating language conferring specific entitlements on individuals. *Sabree*, 367 F.3d at 190.

Unlike Section 30(A), the entitlement and reasonable promptness mandates speak to the benefits to the individuals covered by Medicaid, rather than simply requirements of the plan itself. *See* 42 U.S.C. 1396a(a)(10)(A) ("provide for making medical assistance available . . . to . . . all individuals" and then enumerating a long list of eligible individuals); *see also* 42 U.S.C. 1396a(a)(8) ("provide that all individuals wishing to make application . . . . such assistance shall be furnished with reasonable promptness to all eligible individuals"). Section 30(A) lacks the rights-creating and individual-focused language so prominent in

15

the entitlement and reasonable promptness mandates; as such, the Court's holding

in *Armstrong* is distinguishable from *Sabree*. Indeed, *Sabree* even highlighted the

individual-focused language of the entitlement and reasonable promptness

mandates in finding that they create private rights. *Sabree*, 367 F.3d at 190

("Further, the 'individual focus' of Sections 1396a(a)(10), 1396d(a)(15), and

1396a(a)(8) is unmistakable").

 After finding that the "shall approve" language of the Medicaid Act did not

reveal congressional intent to create a private right of action, the *Armstrong* Court

concluded that two aspects of Section 30(A), when considered together,

"establish[ed] Congress's intent to foreclose equitable relief." 135 S. Ct. at 1385

(internal quotation omitted). One of those aspects is equally applicable to the

entitlement and reasonable promptness mandate – that the remedy provided by

Congress for failure to comply with the provisions of the Medicaid Act is the

administrative withholding of funds. *Id*. The Court made explicit, however, that

"[t]he provision for the Secretary's enforcement by withholding funds might not,

*by itself*, preclude the availability of equitable relief." *Id*. (emphasis in original).

Rather, the Court explained that the provision for administrative remedy "when

combined with the judicially unadministrable nature of § 30(A)'s text" forecloses

private enforcement. *Id*. The Court noted that "[i]t is difficult to imagine a

requirement broader and less specific than § 30(A)'s mandate." *Id*. Again, the

Third Circuit's holding in *Sabree* already determined that the entitlement and reasonable promptness mandates are distinguishable in this regard. *Sabree*, 367 F.3d at 189-190. The *Sabree* Court held that these provisions "conferred specific entitlements on individuals in terms that could not be clearer . . . There is no ambiguity." *Id*. at 190 (internal quotations omitted). The entitlement and reasonable promptness provisions therefore do not have the two aspects that *together* revealed Congress's intent to foreclose individual causes of action under Section 30(A). Thus, *Armstrong* is inapplicable to the case at bar.

The reasoning of *Armstrong* is not at odds with *Sabree* because of the distinguishing characteristics of the provisions involved. The entitlement and reasonable promptness mandates are far more individual-focused and do not present the "judicially unadministrable nature" of Section 30(A). *Armstrong*, 135 S. Ct. at 1385. We are bound to follow Third Circuit precedent, and *Sabree* has conclusively held that Sections 1396a(a)(10)(A) and 1396a(a)(8) confer privately enforceable rights upon individuals. We shall therefore deny the Motion as it seeks dismissal of Count II, and likewise deny the Motion as it seeks dismissal of Count I to the extent it is premised on 1396a(a)(10)(A).

### C. Title XIX, Section 1396a(a)(43)(C)

In addition to alleging a violation of 1396a(a)(10)(A), Count I alleges that Defendants violated 1396a(a)(43)(C). Section 1396a(a)(43) requires the state plan

17

to "provide for informing all persons in the State who are under the age of 21 and who have been determined to be eligible for medical assistance . . . of the availability of early and periodic screening, diagnostic, and treatment services." 42 U.S.C. § 1396a(a)(43)(A). Section 1396a(a)(43)(C) requires that the plan provide for arranging those Early and Periodic Screening, Diagnosis and Treatment ("EPSDT") services. 42 U.S.C. § 1396a(a)(43)(C). We will refer to this provision as the "EPSDT mandate."

The Third Circuit has not considered whether the EPSDT mandate confers privately enforceable rights upon individuals. Plaintiffs argue that the EPSDT mandate meets the criteria of the *Blessing-Gonzaga* frameworks, and points to various courts that have held accordingly.[6] (Doc. 18, p. 8). Several other courts in addition to those cited by Plaintiffs have similarly held that the EPSDT mandate creates a private right of action for individuals. *See, e.g.*, *J.E. v. Wong*, 125 F. Supp. 3d 1099, 1107 (D. Haw. 2015); *O.B. v. Norwood*, 838 F.3d 837, 843 (7th Cir. 2016) (affirming injunction against the state brought by Medicaid beneficiaries seeking to enforce 1396a(a)(8), (43)(C), and (4)(B)); *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 605 (5th Cir. 2004); *Salazar v. D.C.*, 729 F. Supp. 2d 257, 271

---

[6] *Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Services*, 293 F.3d 472 (8th Cir. 2002); *William v. Horton*, 2016 WL 6582682 (N. D. Ga. Nov. 7, 2016); *N.B. v. Hamos*, 2013 WL 6354152 (N.D. Ill. Dec. 5, 2013); *John B. v. Emkes*, 852 F.Supp.2d 944 (M.D. Tenn. 2012), *aff'd* 710 F.3d 394 (6th Cir. 2013).

(D.D.C. 2010) ("[T]he Court concludes that the statutory text imposes a binding obligation on Defendants to provide EPSDT services").

We hold without difficulty in this case of first impression that the EPSDT mandate satisfies the three-part test from *Blessing*, as clarified by *Gonzaga*. *Blessing*, 520 U.S. at 340-341; *Gonzaga*, 536 U.S. at 283. First, Plaintiffs are clearly the intended beneficiaries of the EPSDT mandate, as they are all under the age of 21 and eligible for the screening and treatment services described in the statute. In keeping with *Gonzaga*'s instruction, we note that Plaintiffs do not merely "fall [ ] within the general zone of interest that the statute is intended to protect," but comprise a specific class of individuals who are to receive services under this provision, as distinguished from all who are eligible for Medicaid services. *Gonzaga*, 536 U.S. at 283. Second, the EPSDT mandate is certainly not "vague and amorphous" such that its enforcement would strain judicial competence. *Blessing*, at 340-341. In fact, the EPSDT mandate is clearly defined in 42 U.S.C. § 1396d(r), where the required screening and treatment services are described in detail. Finally, the language of the EPSDT provision is mandatory, rather than precatory, in conferring an unambiguous obligation on the states to provide necessary treatment and services.

Having found that all three aspects of the *Blessing* test have been satisfied, we now consider whether Congress unambiguously conferred a private right of

action using "rights-creating" terms. *Gonzaga*, 536 U.S. at 284. Defendants offer no argument that the three requirements of the *Blessing* framework are not satisfied. Rather, each of Defendants' arguments is focused on their contention that the EPSDT mandate does not unambiguously confer individual rights. As we will explain in more detail when addressing Defendants' arguments, we hold that the EPSDT mandate contains specific language and an individualistic focus that demonstrates Congress' intent to confer private rights of action to individuals.

Defendants devote less than two pages to their argument that "Plaintiffs have no privately enforceable right to EPSDT services under 42 U.S.C. § 1396a(a)(43)(C)." (Doc. 16, p. 9). Defendants argue that the entire section, and specifically section (a)(43)(C), "is devoid of any language that unambiguously confers individual rights." (*Id*.). "Rather, the text of the statutory section has an aggregate focus and is directed toward the regulated entity." (*Id*. at p. 9-10). Defendants then note that the types of EPSDT services that a state must provide are varied and specific to the individual, and reiterate that the Medicaid Act already has an administrative remedy for noncompliance. (*Id*. at p. 10). "For these reasons," Defendants argue that 1396a(a)(43)(C) is analogous to Section 30(A) from *Armstrong* and is not privately enforceable. (*Id*.). It is noteworthy that Defendants do not offer any case law where a court has held that 1396a(a)(43)(C) does not create a private right of action.

Each of Defendants' proffered reasons to support a finding that the EPSDT mandate does not confer privately enforceable rights applies with equal force to 1396a(a)(10), which, as we know, the Third Circuit has already found creates a private right of action. *See Sabree*, 367 F.3d at 189-190. First, rather than being "devoid" of any rights-creating language,1396a(a)(43) contains the same language that the *Sabree* court labeled as "rights-creating" in 1396a(a)(10). *Id*. at 190. Both sections begin with, "A State plan must provide" and, importantly, are coupled with an individual-focus. Section 1396a(a)(10) is centered on the requirement that the plan make medical assistance available to individuals and 1396a(a)(43) requires a plan to inform a class of those individuals of the availability of medical assistance, with 1396a(a)(43)(C) specifically requiring the plan to arrange for that medical assistance to individuals. This individualistic focus is in contrast with Section 30(A), which concerns the "methods and procedures relating to the utilization of, and the payment for, care and services available under the plan." 42 U.S.C. 1396a(a)(30)(A). Though this section also begins with the same language "A State plan must provide," it does not contain an individualistic focus, but rather focuses on the methods and procedures for utilizing and paying for services.

Second, Defendants point out that the EPSDT mandate "has an aggregate focus and is directed toward the regulated entity," but again, this applies to 1396a(a)(10) as well. (Doc. 16, pp. 9-10). Indeed, the vast majority of the

Medicaid Act is directed toward the regulated entity and "plumbing for congressional intent by balancing the specific language of a few discrete provisions of Title XIX is a difficult task." *Sabree*, 367 F.3d at 192. Each provision is pointed toward the regulated entity and describing what aspects the state plan must contain. Nonetheless, the Third Circuit held that the specific, individual-focused language of 1396a(a)(10), 1396d(a)(15), and 1396a(a)(8) "unambiguously confers rights which plaintiffs can enforce." *Id*. This individual focus, as aforementioned, is present in the EPSDT mandate and absent from Section 30(A).

Third, Defendants note that the EPSDT mandate requires that a state plan arrange for a wide range of services that "will be as diverse as the individuals receiving EPSDT services." (Doc. 16, p. 10). To this argument, we must simply point again to the entitlement mandate that requires the plan to "provide for making medical assistance available." 42 U.S.C. 1396a(a)(10)(A). The type of medical assistance that the plan must make available to the widely varied groups of individuals enumerated will undoubtedly be extremely diverse – indeed, the medical services that the plan must make available under the entitlement mandate, which applies to all eligible individuals, will be far more varied than the EPSDT mandate, which is directed just towards those under the age of 21. Yet, this was not even a factor considered by the *Sabree* Court when it concluded that the entitlement mandate creates a private right of action. We therefore are not

persuaded by Defendants' argument that this aspect of the EPSDT mandate counsels against a finding of a private right of action.

Finally, Defendants point to the Medicaid Act's administrative remedy to support their argument that the EPSDT does not confer a private right of action. (Doc. 16, p. 10). The existence of a built-in administrative remedy for noncompliance is certainly an important factor to consider in assessing whether the EPSDT mandate confers individual rights. As the Third Circuit recognized in *Sabree*,

> This language not only confirms that Title XIX by its terms creates a relationship between Congress and a particular state, but it recalls, as well, the "comply substantially" language in *Blessing* and *Gonzaga University*. *Blessing*, 520 U.S. at 343, 117 S.Ct. 1353; *Gonzaga Univ.*, 536 U.S. at 289, 122 S.Ct. 2268. Of course, in *Blessing* and *Gonzaga University*, such language counseled against the recognition of an unambiguously conferred right.

*Sabree*, 367 F.3d at 191-192. The Third Circuit went on, however, to hold that "the appropriations and general introductory statement [] cannot neutralize the rights-creating language of" the sections. *Id*. at 192. We again reiterate that it was the language, "A State plan must provide", coupled with an individual-focus that the Court defined as unambiguous, rights-creating language. *Id*. at 190. Because the EPSDT mandate has the same characteristics as the entitlement mandate that the Third Circuit found "conferred specific entitlements on individuals 'in terms that could not be clearer,'" we are duty-bound to follow *Sabree*. *Id*. at 192.

23

We thus hold that the EPSDT mandate, embodied at 42 U.S.C. 1396a(a)(43) and its subparts, confers a private right of action on individuals such as the Plaintiffs. We therefore will deny the Motion as it seeks to dismiss Count I.

### D. The ADA, the RA, and Implementing Regulations

In Count III of the complaint, Plaintiffs allege that Defendants have discriminated against them on the basis of their disability, in violation of the ADA and the RA. (Doc. 1, ¶¶ 173-184). As a threshold matter, both parties recognize that "[i]n light of the similarities between the integration provisions of the ADA and RA and their implementing regulations," the Third Circuit instructs that we "construe and apply them in a consistent manner." *Pennsylvania Prot. & Advocacy, Inc. v. Pennsylvania Dep't of Pub. Welfare*, 402 F.3d 374, 379 (3d Cir. 2005). Our analysis of Plaintiffs' claims under the ADA, therefore, applies with equal vigor to Plaintiffs' claims pursuant to the RA.

Plaintiffs allege that specific actions and omissions by the Defendants constitute violations of the ADA and the RA, citing to various sections of the Code of Federal Regulations promulgated by Congress to implement the ADA and the RA. Specifically, Plaintiffs allege that Defendants, on the basis of Plaintiffs' disabilities,

> a. Deny Plaintiffs the opportunity to participate in and benefit from publicly funded Child Welfare services, including but not limited to foster homes and group homes;

    b.  Afford Plaintiffs opportunities to participate in or benefit from publicly funded Child Welfare services that are not equal to that afforded others;

    c.  Provide Plaintiffs publicly funded Child Welfare services that are not as effective as those provided to others; and,

    d.  Limit Plaintiffs in the enjoyment of the rights, privileges, advantage, and opportunities enjoyed by others receiving its Child Welfare services, including family visits and reunification services, stability and permanency, community-based services and placements, and appropriate treatment.

(*Id*. at ¶ 179). These allegations track the language of 28 C.F.R. §§ 35.130(a) and (b)(1)(i-ii, and vii), 42.51(b)(1)(i-ii and v), and 45 C.F.R. §§ 84.4(b)(1)(i-iii, and vii) and 84.52(a). Plaintiffs further allege that "Defendants also aid and perpetuate discrimination against Plaintiffs by providing significant assistance to county Child Welfare agencies which discriminate against them." (*Id*. at ¶ 180). This allegation tracks the language of 28 C.F.R. §§ 35.130(b)(1)(v) and 41.51(b)(1)(v) and 45 C.F.R. § 84.4(b)(1)(v). Plaintiffs allege that "defendants unlawfully utilize methods of administration that" have the effect of subjecting Plaintiffs to disability discrimination and defeat or substantially impair accomplishment of the objectives of the Child Welfare system. (*Id*. at ¶ 181). This allegation tracks the language of 28 C.F.R. §§ 35.130(b)(3) and 41.51(b)(3)(i) and (ii), and 45 C.F.R. § 84.4(b)(4).

Plaintiffs also allege that "Defendants have failed to make reasonable modifications in policies, practices and procedures when necessary to avoid discrimination," citing to 28 C.F.R. §§ 35.130(b)(7) and 41.53. (*Id*. at ¶ 182). Finally, Plaintiffs allege that Defendants "unlawfully fail to administer the Child Welfare program and the MA program in the most integrated settings appropriate to Plaintiffs' needs," citing 28 C.F.R. §§ 35.130(d) and 41.51(d), and 45 C.F.R. § 84.4(b)(2). (*Id*. at ¶ 183). Defendants focus their arguments for dismissal on these two regulations, which we will refer to as the "reasonable modifications regulation" and the "integration regulation."

Defendants move to dismiss Count III as it is based on alleged violations of the reasonable modifications and integration regulations because "[n]either the ADA nor the RA contains any language that mentions, much less requires, reasonable modifications, services in the most integrated setting, or the types of services to be provided." (Doc. 16, p. 16). Therefore, Defendants argue "the purported rights ostensibly created by the regulations and relied upon by Plaintiffs are not privately enforceable" and "Plaintiffs have failed to state a claim based on those regulations." (*Id*.). Plaintiffs counter that their claims are brought pursuant to the broad prohibition on discrimination embodied by the ADA and the RA. (Doc. 18, pp. 15-18). Even if the implementing regulations are not independently enforceable, Plaintiffs argue that they are entitled to rely on them to interpret the

ADA and RA as "authoritative interpretations" of the statutes, or, at a minimum, "provisions that define and flesh out the statute." (*Id*. at p. 16).

The Supreme Court considered the integration and reasonable modifications regulations in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 582 (1999). In *Olmstead*, the Court considered "whether the proscription of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions." 527 U.S. at 587. "The answer, [the Court held], is a qualified yes." *Id*. The Court began with an examination of the ADA, starting with the opening provision where Congress determined that,

> (2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;
>
> (3) discrimination against individuals with disabilities persists in such critical areas as . . . institutionalization . . .;
>
> . . .
>
> (5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, . . . failure to make modifications to existing facilities and practices, . . . [and] segregation. . .

*Id*. at 588-589 (citing 42 U.S.C. §§ 12101(a)(2), (3), (5)). The ADA then goes on to set forth prohibitions against discrimination in employment, public services, and public accommodations. *Id*. at 589. As is the case here, *Olmstead*

concerned Title II of the ADA, the public services section. *Id*. The central

provision of Title II reads,

> Subject to the provisions of this subchapter, no qualified individual
> with a disability shall, by reason of such disability, be excluded from
> participation in or be denied the benefits of the services, programs, or
> activities of a public entity, or be subjected to discrimination by any
> such entity.

42 U.S.C. § 12132. In the definition section, Title II defines a "qualified

individual with a disability" as,

> an individual with a disability who, with or without reasonable
> modifications to rules, policies, or practices, the removal of
> architectural, communication, or transportation barriers, or the
> provision of auxiliary aids and services, meets the essential eligibility
> requirements for the receipt of services or the participation in
> programs or activities provided by a public entity.

42 U.S.C. § 12131(2). Title II states that the redress for violations of §

12132's discrimination provision shall be the same as those under the RA. 42

U.S.C. § 12133. Finally, Congress instructed the Attorney General to issue

regulations to implement the prohibition on discrimination, and further directed

that those regulations "be consistent with this chapter and with the coordination

regulations" of the RA. 42 U.S.C. § 12134. As instructed, the Attorney General

issued Title II regulations, codified at 28 C.F.R. part 35. Those regulations include

the integration and reasonable modifications regulations.

Considering these legislative provisions, the Court concluded in *Olmstead*

that "[u]njustified isolation" of a disabled individual "is properly regarded as

discrimination based on disability." 527 U.S. at 597. "Ultimately, in the ADA,

enacted in 1990, Congress not only required all public entities to refrain from

discrimination . . .; additionally, in findings applicable to the entire statute,

Congress explicitly identified unjustified 'segregation' of persons with disabilities

as a 'for[m] of discrimination.'" *Id*. at 600 (quoting §§ 12101(a)(2) and (a)(5)).

The Supreme Court therefore made clear that the unjustified isolation of

individuals with disabilities can constitute actionable discrimination in certain

circumstances. *Id*.

Defendants respond that *Olmstead* did not specifically address whether the

regulations are privately enforceable and was decided prior to the Supreme Court's

decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001). In *Sandoval*, the Court

considered whether there is a private right of action to enforce the disparate-impact

regulations promulgated under Title VII of the Civil Rights Act of 1964. 532 U.S.

at 275. After noting that "private individuals may sue to enforce § 601 of Title VI,"

*id*. at 279, the Court explained,

> We do not doubt that regulations applying § 601's ban on intentional
> discrimination are covered by the cause of action to enforce that
> section. Such regulations, if valid and reasonable, authoritatively
> construe the statute itself . . . and it is therefore meaningless to talk
> about a separate cause of action to enforce the regulations apart from
> the statute. A congress that intends the statute to be enforced through
> a private cause of action intends the authoritative interpretation of the
> statute to be so enforced as well.

*Id*. at 284. However, the Court explained that "the disparate-impact regulations do not simply apply § 601" because § 601 only reaches intentional discrimination. *Id*. at 285. "[S]ince they indeed forbid conduct that § 601 permits," the disparate-impact regulations cannot be covered by the private right of action to enforce § 601. *Id*. Instead, the disparate-impact regulations apply rights that "must come, if at all, from the independent force of § 602." *Id*. at 286. The Court thereafter analyzed § 602 and determined that § 602 does not evidence congressional intent to create a private action. *Id*. at 289. Therefore, the Court concluded that regulations promulgated to apply § 602, including the disparate-impact regulations, are likewise not actionable. *Id*. at 286.

Contrary to Defendants' contentions, the analytical guidance offered by *Sandoval* actually supports a finding that the integration and reasonable modifications regulations are enforceable. Consistent with *Sandoval*, we start by examining the statute under which the regulations arise. The Supreme Court has already done this in *Olmstead*, noting that "in findings applicable to the entire statute, Congress explicitly identified unjustified 'segregation' of persons with disabilities as a 'for[m] of discrimination.'" 527 U.S. at 600 (quoting §§ 12101(a)(2) and (a)(5)). The integration regulation therefore finds its genesis in the statutory text itself. Similarly, the *Olmstead* Court noted that the statutory text incorporates the reasonable modifications regulation by defining a "qualified

individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services . . ." meets certain eligibility requirements. 42 U.S.C. § 12131(2). Further, Congress included in its statement of findings applicable to the ADA as a whole that "individuals with disabilities continually encounter various forms of discrimination, including ... failure to make modifications to existing facilities and practices." 42 U.S.C. § 12101(a)(5). The Supreme Court has referred to this as "Title II's affirmative obligation to accommodate persons with disabilities." *Tennessee v. Lane*, 541 U.S. 509, 533 (2004). Again we see that the statutory text itself incorporates the right upon which the reasonable modifications regulation is founded.

Defendants mischaracterize *Sandoval* by stating that "[t]he Court noted that where the **regulation** is a directive to an agency, as opposed to focusing on the individuals protected, there is far less reason to infer a private remedy." (Doc. 16, p. 16) (emphasis added). This is not the case; the Court in *Sandoval* looked to whether the **statute** focused on the individuals protected or the regulated agency to determine if the **statute** created a private right of action, not the regulation. 532 U.S. at 289. If the statute created a private right of action, and the regulation applied the statute, then the regulation could be brought within that right of action.

*Id*. The statute at issue in *Sandoval* was much like the Medicaid Act in that it related to federally funded programs, and the Court performed the same inquiry we did in the previous sections to determine whether that statute conferred private rights, ultimately finding it did not. *Id*. Here, the regulations are promulgated under the ADA and the RA, and there can be no dispute that these statutes can be enforced through a private right of action. *Barnes v. Gorman*, 536 U.S. 181, 184 (2002).

We therefore conclude that the statutory text of the ADA and the RA creates the rights under which the integration and reasonable modifications regulations arise, and that the regulations do not exceed the scope of those rights. Accordingly, because the statutes are enforceable through private action, Plaintiffs' reliance on those regulations to state a claim of discrimination is appropriate.

## IV.    CONCLUSION

Defendants' Motion is premised entirely on the contention that Plaintiffs' claims are not privately enforceable. For the foregoing reasons, we hold that Plaintiffs' complaint is based upon enforceable provisions of Title XIX, the ADA, and the RA. As a result, the motion to dismiss will be denied in its entirety.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.  Defendants' motion to dismiss (Doc. 15) is **DENIED**.

s/ John E. Jones III
John E. Jones III
U.S. District Judge